**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **PHILIP and DEVRA PULLEY, individually and on behalf of themselves and all others similarly situated,** | **CIVIL ACTION NO.:** |
| **Plaintiff** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **JPMORGAN CHASE BANK, N.A. and CHASE BANK USA, N.A.** | |
| **Defendants** | |

**CLASS ACTION COMPLAINT**

1.      Plaintiffs Philip and Devra Pulley, ("Plaintiffs") on behalf of themselves and all other similarly situated homeowners who have or had residential mortgage loans originated and/or serviced by defendants JPMorgan Chase Bank, N.A. ("JPMorgan"), Chase Bank USA, N.A. ("Chase Bank") and/or non-Defendant Chase Home Finance, LLC[1] ("Chase Home Finance") between May 16, 2008 and the present (the "Class Period") and, in connection therewith, were required to pay for "force-placed" hazard insurance policies.

2.      In the event that borrowers fail to maintain their hazard insurance policies, rather than attempt to maintain delinquent borrowers' existing policies, Defendants commonly choose to replace borrowers' insurance policies with more expensive ones, known as "force-placed"

---

[1] Chase Home Finance, previously a wholly-owned subsidiary of Defendant JPMorgan has served as the primary servicing unit for loans originated and/or acquired by affiliates of ultimate parent JPMorgan Chase & Co.  Upon information and belief, on or about May 1, 2011, Chase Home Finance was merged with and into Defendant JPMorgan, with Defendant JPMorgan as the surviving entity. Accordingly, as described herein, Defendant JPMorgan is named as a defendant in this action both in its own capacity and as successor-in-interest to Chase Home Finance.

insurance policies. Such policies provide less coverage and are substantially more costly than the borrowers' original policies, while providing lucrative financial benefits to servicers and/or their affiliates. Further, such policies often provide unnecessary or duplicative coverage, in that they are improperly backdated to collect premiums for time periods during which there is absolutely no risk of loss.

       3.     As the *American Banker* recently observed:

> When banks buy insurance on the homes of borrowers whose policies have lapsed, they get a great deal. Just not for the homeowners and investors who have to pay for it.
>
> Nominally purchased to protect the owners of mortgage-backed securities, such "force-placed" insurance can be 10 times as costly as regular policies, raising struggling homeowners' debt loads, pushing them toward foreclosure — and worsening the loss to investors on each defaulted loan.
>
> Evidence of abuses and self-dealing in the force-placed insurance industry suggests that there may be far larger problems in how servicers are handling distressed loans than the sloppy document recording that has been the recent focus of industry woes.
>
> Behind banks' servicing insurance practices lie conflicts of interest that align servicers and their insurer partners against borrowers and investors. Bank of America Corp. owns a force-placed insurance subsidiary, and most other major servicers receive commissions or reinsurance fees on the very same policies they purchase on investors' and borrowers' behalf.

*See* Jeff Horwitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble,* American Banker (Nov. 9, 2010)(hereinafter "*Ties to Insurers*"), available at:

http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?zkPrintable=1&nopagination=1

       4.     In this action, Plaintiffs challenge, among other things and as further described herein, Defendants' decision to purchase force-placed hazard insurance from insurers that

provide a financial benefit to Defendants and/or their affiliates and at rates that far exceed borrower-purchased hazard insurance.

5.      Throughout the Class Period, Defendants have engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including, among others and as described in further detail below: (a) receiving fees, payments, commission, improper reinsurance premiums and/or other things of value from providers of force-placed insurance; (b) providing force-placed insurance from their own affiliates at an improperly high cost to the borrower; and (c) forcing borrowers to pay for unnecessary insurance.

6.      Defendants' unlawful actions include, *inter alia,* purchasing unconscionably high-priced insurance policies, having pre-arranged agreements to purchase force-placed insurance from a single company in which they have a financial interest to maximize their own profits, backdating the force-placed policies to charge for retroactive coverage, and giving and receiving "commissions" or "kickbacks" for the procurement of the force-placed policies. These actions constitute a pattern of exploitative profiteering and self-dealing against the interest of Plaintiffs and the absent Class members.

7.      Defendants have effectuated a scheme whereby, in violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA"): (a) illegal referral payments in the form of purported reinsurance premiums are paid by force-placed insurance providers to Defendants' own subsidiary/affiliate; and (b) Defendants receive an unlawful split of insurance premiums paid by borrowers.

8.      Upon information and belief, Defendants have also negotiated deals with force placed insurance providers, pursuant to which Defendants receive a percentage of the cost of the premiums of each force-placed insurance policy purchased for a borrower.

9.     Following this scheme, Defendants collect disguised, unlawful referral fees in violation of RESPA's anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

10.     In this action, Plaintiffs challenge Defendants' unlawful conduct as violative of RESPA and seek statutory damages.

11.     Plaintiffs also assert state law claims, as Defendants have breached their contractual obligations, including their implied covenants of good faith and fair dealing, owed to Plaintiff and the other Class members and engaged in unfair, deceptive and/or fraudulent business practices as further described below.

12.     At issue in this case, is whether Defendants engaged in unfair, deceptive and/or fraudulent business, whether Defendants manipulated the force-placed insurance process so as to obtain kickbacks, and whether by doing so, Defendants have violated their duty of good faith and fair dealing to the Plaintiffs and the Class.  Plaintiffs and the Class seek statutory and compensatory damages for the harm caused by Defendants' unlawful conduct, as well as restitution for Defendants' unjust enrichment.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

14.     This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").   Plaintiffs are citizens of the Commonwealth of Pennsylvania and own a home in the State of Florida.  Defendants are citizens of different states. The amount in controversy in this action exceeds $5,000,000, and there are more than 100 members the classes.

15.     In addition, this Court has diversity jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(a). The matter in controversy is greater than $75,000 and this matter is between citizens of different states. This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in Plaintiff's mortgage loan transaction is located in this district, Defendants regularly conduct business in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

17.     Plaintiffs Philip and Devra Pulley (the "Pulleys") own a home in Lighthouse Point, Florida.  On or about March 23, 2005, the Pulleys entered into a mortgage loan agreement with Washington Mutual Bank, F.A., secured by their residence in Lighthouse Point, Florida ("Pulley Mortgage"). *See* Pulley Mortgage, attached as Exhibit 1 hereto.

18.     With respect to insurance, the Pulley Mortgage states in section 5 entitled "Property Insurance":

> Borrower shall keep the improvements now existing or hereinafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.

19.     Although not required by their mortgage, on or about September 12, 2005, the Pulleys obtained a wind hazard insurance policy from Citizens Property Insurance Company with an annual premium of $7,735.00.  The policy provided $1,200,000.00 of coverage on the structure and $600,000 of coverage on the contents of their home.  *See* Citizens Property Insurance Company Wind Only Policy ("Citizens Wind Policy") attached hereto as Exhibit 2.

20.     The Pulleys have continually maintained their Citizens Wind Policy from 2005 to the present date, never paying more than $9,612.00 for their annual premium.

21.     During September 2008, JPMorgan acquired the Pulley's mortgage from Washington Mutual Bank F.A.

22.     On or about September 15, 2010, Chase Home Finance notified the Pulleys that it did not have records of their wind insurance policy.

23.     On September 28, 2010, Chase Home Finance entered into a loan modification agreement with the Pulleys, which amended the original mortgage on their property.  That loan modification agreement, as with the original Pulley Mortgage did not require the Pulleys to obtain a wind hazard insurance policy.

24.     On October 28, 2010, Mr. Pulley forwarded to Chase Home Finance a copy of proof of the Pulleys' Citizens Wind Policy.  In addition, Mr. Pulley directed his insurance agent to provide the same information to Chase Home Finance.

25.     Despite proof of the Pulleys' Citizens Wind Policy, on November 25, 2010 Chase Home Finance sent to the Pulleys a Notice of Purchase of Wind Insurance with a copy of a Residential Windstorm Policy from Voyager Indemnity Insurance Company ("Voyager Wind Policy").  *See* November 25, 2010 letter from Chase Home Finance to Philip and Devra Pulley attached as Exhibit 3.  Chase Home Finance force-placed on the Pulleys' home a one year wind hazard policy from Voyager Indemnity Insurance Company with an annual premium of $61,629.75, which provided $1,638,000.00 of coverage on only the structure.[2]   The premium for the Voyager Wind Policy was over 6 times the premium of the Pulleys' Citizens Wind Policy.  In addition, the Voyager Wind Policy was backdated to September 12, 2010, despite the fact that

---

[2] At the time the principal balance of the mortgage on the Pulleys' home was $1,458,731.89.

there was no damage to the property or claims arising out of the property for period of the alleged lapse in coverage.

26.      Chase Home Finance then added the $61,629.75 annual premium to the Pulley's escrow account which resulted in a $5,135.8 increase in their monthly mortgage payment.

### DEFENDANTS

27.      Defendant JPMorgan, a subsidiary of JPMorgan Chase & Co., is a national banking association that conducts business in Florida and other states throughout the United States.  Non-party Chase Home Finance, LLC ("Chase Home Finance") is a Delaware limited liability company that, during the relevant time period, served as the primary servicing unit for loans originated and/or acquired by affiliates of ultimate parent JPMorgan Chase & Co.  On or about May 1, 2011**,** Chase Home Finance was merged with and into Defendant JPMorgan, with Defendant JPMorgan as the surviving entity. Accordingly, Defendant JPMorgan is named as a defendant in this action both in its own capacity and as successor-in-interest to Chase Home Finance.

28.      Defendant Chase Bank, a subsidiary of JPMorgan Chase & Co., is a national banking association that conducts business in Florida and other states throughout the United States.

29.      In all of its actions described herein, Chase Home Finance acted on its own behalf and as the duly authorized agent of Defendants JPMorgan and Chase Bank or other owners of the underlying notes and mortgage agreements. Defendants were contractually obligated to service the loans at issue pursuant to the terms of the mortgage contracts.

## FACTUAL ALLEGATIONS

30.     Defendants JPMorgan and Chase Bank originate mortgage loans and acquire

loans from other lenders. Each such loan is secured by a deed of trust on the underlying property.

Prior to its merger into Defendant JPMorgan, Chase Home Finance acted as the servicer of these

loans.

31.     Upon information and belief, Defendants have a significant indirect financial

stake in Voyager Indemnity Insurance Company ("Voyager Indemnity"), a company that issues

force-placed windstorm insurance policies for Defendants. Specifically, Voyager Indemnity is a

wholly-owned subsidiary of Assurant, Inc. ("Assurant"). *See* Assurant, Inc., Annual Report

(Form 10-K), Exhibit 21 (February 23, 2011).  As of January 19, 2010, JPMorgan Chase & Co.

(the parent company of each of the Defendants) held 3,829,722 shares in Assurant through

JPMorgan and other affiliates. *See* JPMorgan Chase & Co., Statement of Acquisition of

Beneficial Ownership (Schedule 13G/ A) (January 19, 2010).

32.     In order to protect the mortgagee's interest in the secured property, mortgage loan

contracts typically allow the lender or third party servicer to "force-place insurance" when the

homeowner fails to maintain hazard insurance. This discretion afforded Defendants to force

place insurance is limited by the bounds of reasonable conduct. Defendants routinely exceed the

bounds of reasonableness through the wrongful conduct described herein with respect to the

forced placement of insurance.

33.     The mortgage contract does not disclose, however, that the lender or other

servicer will receive a commission or reinsurance premium from force-placed insurance

providers for purchasing the insurance from them. The mortgage contract also does not disclose

that this payment will be based upon a percentage of the cost of the premium of the force-placed

insurance. Instead, the contract misrepresents to borrowers that the cost of the force-placed insurance is necessary to protect the lender's interest in the secured property.

34.     Borrowers are generally unaware that the force-placed policy often covers only the loan amount, rather than the full value of the home. Because most forced placed insurance policies do not insure the contents of the property, the borrower could sustain a substantial loss if the home is damaged or destroyed.

35.     These lender-placed or "force-placed" insurance policies are always more expensive than market-driven insurance coverage. Reportedly, such policies can cost as much as ten times more than competitively priced policies. While the force-placed insurance policy is for the benefit of the lender, the cost is passed on to the borrower.

**Defendants Receive Kickbacks in Violation of Their Duties to Borrowers**

36.     The force-placing of insurance policies can be a very lucrative business for servicers. Mortgage servicers, including Defendants, routinely receive kickbacks and commissions from insurance companies for placing borrowers into force-placed insurance, totaling as much as 40% of the premiums paid by homeowners. The mortgage servicer benefits by placing the policy either: (a) with an affiliate or (b) with a third party provider who has already agreed to share revenue with the servicer in the form a direct commission payment or through "reinsurance" premiums ceded to a subsidiary/affiliate of the servicer (a "captive reinsurance arrangement").

37.     Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the servicer or to a subsidiary posing as an insurance "agent."  Typically, under such an arrangement, commissions are paid to a "licensed insurance

9

agency" that is simply an affiliate or subsidiary of the servicer that does no insurance business

and exists solely to receive kickbacks or commissions from force-placed insurance providers.

38.     Under the captive reinsurance arrangement, the provider of the force-placed

insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or

"captive reinsurer" of the referring mortgage servicer. In return for the subsidiary purportedly

agreeing to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a

portion of the premiums received on account of the policy. For example, Assurant – the nation's

largest provider of force-placed insurance - has admitted that its force-placed insurance division

"writes[s] business produced by clients, such as mortgage lenders and servicers and financial

institutions, and reinsures all or a portion of such business to insurance subsidiaries of the

clients." *See* Assurant, Inc., Annual Report (Form 10-K), at 81 (February 25, 2010).

39.     According to a recent Reuters article, "JPMorgan Chase buys overpriced

insurance from a third-party insurer, which then reinsures the property with JPMorgan Chase.

This is doubly evil: it not only means that investors are paying far too much money for the

insurance, but it also means that, as both the servicer and the ultimate insurer of the property,

JPMorgan Chase has every incentive not to pursue claims on the houses it services. Investors, of

course, would love to recoup any losses from the insurer, but they can't bring such a claim - only

the servicer can do that." Reuters Blog Nov. 9, 2010, "*The force-placed insurance scandal*,"

available at http://blogs.reuters.com/felix-salmon/2010/11/09/the-force-placed-insurance
scandal/.

40.     This is corroborated by JPMorgan's own November 25, 2010 notice to Plaintiffs,

which states: "The wind insurance we obtained is primarily for the benefit of the person or

company who presently owns your mortgage loan.  If you incur property damage or loss, you

may not have adequate coverage for any damages that you suffer because the person or company that owns your loan will be paid first…As previously indicated, a Chase affiliate will receive an economic benefit in connection with the wind insurance purchased for you." *See* Exhibit 3, attached hereto.

41.    Illustrative of the arrangements is the following graphic from *American Banker:*



42.    Borrowers have no opportunity to comparison-shop for force-placed insurance policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.

43.     For their part, servicers have no incentive to seek the best rate. Rather, servicers are financially motivated to force borrowers to the insurer that will provide the greatest financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums.

44.     Commonly, a mortgage loan servicer enters into an agreement with a provider, pursuant to which it refers borrowers exclusively to the provider for force-placed insurance. For example, in its public filings, Assurant-the nation's largest provider of force-placed insurance policies and the parent of Voyager Indemnity-states that it establishes "long-term relationships" with leading lenders and servicers and that the majority of its lender-placed agreements are exclusive. *See* Assurant, Inc., Annual Report (Form 10-K), at 5 (February 23, 2011)("The majority of our lender-placed agreements are exclusive.").

45.     Force-placed insurance policies are not underwritten on an individual policy basis. Rather, upon information and belief, servicers' contracts with force-placed insurance providers require or at least permit the insurer automatically to issue these policies when a borrower's insurance coverage is not maintained.

46.     Servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider.  The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property. In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the servicer. Thus, where these mortgage servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral.

47.     Mortgage servicers profit greatly from the business of force-placed insurance. According to recent article published by *American Banker,* "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year."

48.     Direct "kickbacks" are also part of the process. "The insurance company that issued the [Homeowner's] new forced place insurance told ABC News that it generally pays Chase a 15 percent commission on such policies." Chris Cuomo, "Insurance Frustration: Family on Brink of Losing Home Get Mortgage Relief Following ABC News Report" ABC News March 10, 2010, available at http://abcnews.go.com/TheLaw/abc-world-news-homeowners-angry-expensive-fixed-place-insurance/story?id=9919670.

49.     Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, as *American Banker* noted:

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry - even after accounting for the generous commissions and other payments that servicers demand.

*See Ties to Insurers*, *supra.*

**Borrowers are Forced to Purchase and Maintain Hazard Insurance for Their Property That is Unnecessary, Duplicative and/or in Amounts Greater than Required by Law or Their Mortgage Agreements.**

50.     Motivated by the lucrative financial incentive associated with force-placing insurance, upon information and belief, Defendants have commonly required borrowers to pay for unnecessary insurance coverage. Such examples include, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the

mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no risk of loss exists for such period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement that already protects the lender's interest in the property.

51.     Simply put, force-placed hazard insurance policies should not be backdated. The National Association of Insurance Commissioners ("NAIC") has indicated that insurance is "prospective in nature." Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is already no risk of loss is improper.

52.     Moreover, many hazard insurance policies contain a Lender's Loss Payable Endorsement. This endorsement typically protects the lender for a period of at least ten days after the termination of the insurance policy. Accordingly, force-placing insurance policies effective immediately following the termination of the borrower's policy and charging borrowers expensive premiums for such insurance is unlawful and unfair because borrowers are charged for needless and duplicative insurance coverage.

**Defendants' Scheme Violates RESPA**

53.     As Brian Sullivan, spokesman for the Department of Housing and Urban Development ("HUD"), has opined, "It is clear that RESPA prohibits fee splitting and unearned fees for services that are not performed."

54.     RESPA is the primary federal law regulating residential mortgage settlement services. HUD is charged with enforcing RESP A and has promulgated the implementing rules for RESPA. See Regulation X, 24 C.F.R. § 3500.

55.     RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers. "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result...in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b).

56.     A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

57.     The term "settlement service" is liberally defined in RESPA and Regulation X and includes the provision of services involving hazard, flood, or other casualty insurance. 24 C.F.R. § 3500.2(b).  RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

Further, RESPA Section 8(b), 12 U.S.c. § 2607(b), provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

58.     Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.l4(c).

59.     The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties,

15

> credits representing monies that may be paid at a future date, the
> opportunity to participate in a money-making program, retained or
> increased earnings, increased equity in a parent or subsidiary
> entity ... The term payment is used as synonymous with the giving
> or receiving any "thing of value" and does not require transfer of
> money. 24. C.F.R. § 3500.l4(d).

Force-placed insurance business referred to insurers by a lender or servicer constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a). Under RESPA, therefore, Defendants are prohibited from accepting referral fees from force-placed insurance providers or from splitting insurance premiums with the insurer other than for services actually performed by the captive reinsurer.

60.     Reinsurance arrangements for force-placed insurance policies can generally take one of two forms: (a) "quota share" or (b) "excess of loss."

61.     In a quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the primary insurer's insured losses. Thus, if the primary insurer experiences losses, the reinsurer is expected to experience losses in the percentage agreed upon in the reinsurance agreement.

62.     Unlike the quota share arrangement, however, the excess of loss method does not necessarily result in any actual "losses" being shifted to the reinsurer.

63.     This is because, in an excess of loss reinsurance arrangement, the reinsurer is liable only for a specified corridor or "band" of loss, with the losses below and above the band being covered by the force-placed insurance provider. In other words, the reinsurer is liable only for claims, or a percentage thereof, above a particular point, commonly known as an attachment or entry point, and subject to a ceiling, commonly known as a detachment or exit point. Under this structure, then, the reinsurer's liability begins, if ever, only when the force-placed insurance

provider's incurred losses and expenses reach the attachment point and ends when such losses reach the detachment point.

64.     The likelihood of the reinsurer experiencing any real losses under this arrangement depends not only on the amount of losses paid by the force-placed insurer (*i.e.* whether the amount of claims paid by the insurer ever reaches the band where the reinsurer's responsibility to pay claims attaches) but also on whether the reinsurance agreement between the reinsurer and the force-placed insurance provider exposes the reinsurer to any real possibility that it may be required to contribute its own money when called upon by the force-placed insurance provider to pay for its share of losses. The absence of any likelihood that the reinsurer will experience any real losses, in turn, reveals the reinsurance agreement between the reinsurer and forced placed insurer to be a sham in that it does not constitute real or commensurately priced reinsurance.

65.     Upon information and belief, Defendants entered into "excess of loss" captive reinsurance arrangements with force-placed insurance providers.

66.     Under "captive reinsurance arrangements," the servicer refers its borrowers to a force-placed insurance provider who agrees to reinsure with the servicer's captive reinsurer. These arrangements require the force-placed insurance provider to cede a percentage of the borrowers' premiums to the servicer's captive reinsurer under an excess-of-loss agreement.

67.     Concerned that captive reinsurance arrangements in the realm of RESPA settlement services would be designed to disguise a funneling of unlawful referral fees, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the substantially similar problem of captive reinsurers in the private mortgage insurance industry. *See* HUD Letter, attached as Exhibit 4 hereto.

68.     The HUD letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services" (emphasis in original). *See Id*.

69.     The HUD letter focuses the RESPA anti-kickback analysis on whether the arrangement between the lender's captive reinsurer and the insurer represents "a real transfer of risk." HUD warned that "The reinsurance transaction cannot be a sham under which premium payments ... are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims." *Id.*

70.     The HUD letter also states "This requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement, under which the reinsurer is bound to participate pro rata in every claim" (emphasis in original).[3] *Id.*

71.     The HUD letter contrasts excess of loss method reinsurance arrangements. HUD states that excess of loss reinsurance contracts can escape characterization as an unlawful referral fee or fee-split only:

> ... if the band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band. Unless there is a real transfer of risk, no real reinsurance services are actually being provided. In either case, the premiums paid ... must be commensurate with the risk.

72.     Upon information and belief, Defendants' captive reinsurance arrangements with force-placed insurance providers: (a) do not provide actual reinsurance services and, in any event

---

[3] However, quota share arrangements do not constitute real or commensurately priced reinsurance if provisions in the reinsurance agreement limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers.

18

(b) provide for the payment to the captive reinsurer premiums that are not commensurate with the risk, if any, assumed by the captive reinsurer.

73.     In reality, Defendants' captive reinsurance arrangements with force-placed insurance providers create no risk and are sham transactions for collecting illegal kickbacks in return for referring force-placed insurance business to certain insurers.

74.     The money Defendants collected from force-placed insurers through "reinsurance" premiums and/or commission payments far exceeded the value of the services, if any, it performed. The amounts paid were simply disguised kickbacks to Defendants for the referral of borrowers to force-placed insurance providers.

75.     By retaining a commission or participating in a captive reinsurance arrangement, the servicer forces the borrower to pay for both the actual cost of the insurance policy and the cost of the kickback. As American Banker observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." *See Ties to Insurers*, *supra.* These costs are ultimately paid by the borrowers.

76.     Thus, Defendants' kickback arrangements with force-placed insurance providers tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders. Amounts paid to servicers as sham reinsurance premiums and commissions have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of such kickbacks-to the detriment of consumers.

77.     Defendants' conduct has threatened and, indeed, stifled competition. As the NAIC recently opined when asked whether pricing in the area of force-placed insurance industry is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." *See Ties to Insurers*, *supra.*

### CLASS ACTION ALLEGATIONS

78.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Classes:

> a class consisting of all persons who have or had a residential mortgage loan or line of credit with JPMorgan, Chase Bank or Chase Home Finance secured by property located in the State of Florida and had hazard insurance force-placed upon the secured property by JPMorgan, Chase Bank or Chase Home Finance between May 16, 2008[4], and the date of final disposition of this action.

79.     The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

80.     The Class is so numerous that joinder of all members is impracticable.

81.     A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

82.     Plaintiffs claims are typical of the claims of the Class.

83.     There are questions of law and fact common to the Class, including but not limited to:

---

[4] Plaintiffs reserves her right to seek modification of the Class Period definition in the likely event that further investigation/discovery reveals a more appropriate and broader time period.

(a)    Whether Defendants had captive reinsurance arrangements with force-placed insurance providers and, if so, whether such arrangements involved sufficient transfer of risk and whether premiums ceded under such arrangements were *bona fide* compensation and solely for services actually performed;

(b) Whether Defendants received commission payments from force-placed insurance providers;

(c) Whether Defendants received payments from force-placed insurance providers that exceeded the value of any services actually performed;

(d) Whether Defendants wrongfully backdated forced-placed insurance policies;

(e) Whether Defendants' conduct constituted an unfair business practice;

(f) Whether Defendants violated their implied covenant of good faith and fair dealing;

(g) Whether Defendants' conduct was unconscionable;

(h) Whether Defendants have been unjustly enriched; and

(h) Whether Defendants are liable to Plaintiffs and the Class for damages and, if so, the measure of such damages.

84.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

85.    The same common issues predominate with respect to all Class members, regardless of whether their loans were originated by or merely serviced by Defendants.

86.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs have retained counsel competent and experienced in complex class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

87.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only

individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF RESPA, 12 U.S.C. § 2607

88.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

89.     Throughout the Class Period, Defendants provided "settlement services" in connection with of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

90.     The amounts received by Defendants through their arrangements with force-placed insurance providers constituted "things of value" within the meaning of RESPA § 2602(2).

91.     Pursuant to captive reinsurance arrangements, Defendants arranged for an unlawfully excessive split of borrowers' premiums to be ceded to Defendants' captive reinsurer under carefully crafted excess of loss reinsurance agreements.

92.     Further, pursuant to pre-arranged commission agreements with force-placed insurance providers, Defendants arranged to receive and did, in fact, receive commission payments from force-placed insurance providers. Upon information and belief, such commission payments were based upon a percentage of the premiums charged to borrowers for force-placed insurance coverage.

93.     The reinsurance premiums and commission payments Defendants accepted from force-placed insurance providers: (a) were not for services actually furnished or performed; and/or (b) exceeded the value of such services.

94.     Further, such amounts constituted fees, kickbacks or things of value pursuant to agreements with force-placed insurance providers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers. Such practice violated RESPA, 12 U.S.C. 2607(a).

95.     Plaintiffs and the Class members were, in fact, harmed by Defendants' unlawful kickback scheme.

96.     First, Plaintiffs and the Class members were, as a matter of law, entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes. Congress has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties without proof of an overcharge. The plain, unambiguous language of RESPA section 8(d)(2) indicates that damages are based on the settlement service amount with no requirement that there have been an overcharge. Plaintiffs allege that Defendants have accepted unlawful kickback payments and/or an unearned portion of settlement service charges in violation of RESPA-allegations and claims completely distinct and separate from whether the price they paid for settlement services was excessive.

97.     Second, though not necessary to prevail on their claims, Plaintiffs and the Class members were, in fact, overcharged for force-placed insurance. Congress has already determined that the *aggregate* effect of an unlawful kickback/referral arrangement is to unnecessarily inflate the costs consumers pay for real estate settlement services and/or reduce competition among

settlement service providers. 12 U.S.C. § 2601(b). ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result...in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."). Thus, kickbacks and unearned fees unnecessarily and artificially inflate settlement service charges. Under Defendants' scheme, the force-placed insurance premiums paid by Plaintiffs and the Class included payments for both: (a) actual insurance services; and (b) payments unlawfully kicked back to Defendants' captive reinsurer that far exceeded the value of any services performed and, were also, in fact, illegal referral fees.

98.    Defendants therefore violated RESPA, 12 U.S.C. 2607.  Pursuant to RESPA, 12 21 U .S.C. 2607( d), Defendants are liable to Plaintiffs and the Class members in an amount equal to three times the amounts they have paid or will have paid for force-placed insurance as of the date of judgment.

99.    In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs also seek attorneys' fees and costs of suit.

## COUNT TWO
## BREACH OF CONTRACT
## (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

100.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

101.    Every contract contains an implied covenant of good faith and fair dealing.

102.    The mortgage contracts of Plaintiffs and the other Class members contained an implied covenant of good faith and fair dealing, pursuant to which Defendants were bound to perform their obligations in good faith and to deal fairly with Plaintiffs and the other Class members.

24

103.   To the extent that the mortgage contracts of Plaintiffs and the Class members permitted Defendants unilaterally to "force-place" insurance, Defendants were obligated not to exercise their discretion capriciously, in bad faith, and for their own financial gain.

104.   Defendants breached their duties of good faith and fair dealing in at least the following respects, among others:

(a) Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead-for the sole purpose of maximizing their own profits-forcing borrowers to pay for insurance policies from providers of Defendants' choice. These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

(b) Using their discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for both (i) the actual cost of protecting the mortgagee's interest in the property and (ii) the cost of the commissions/reinsurance premiums Defendants accepted from the force-placed insurance provider;

(c) Failing to seek competitive bids on the open market or otherwise making reasonable good faith efforts to exercise their discretion and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased at excessive costs through the same companies in order to produce additional profits for Defendants;

(d) Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiffs and Class and misrepresenting the reason for the cost of the policies;

(e) Collecting a percentage of the force-placed premiums charged to Plaintiffs and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(f) Accepting purported reinsurance premiums and/or commissions in return for placing borrowers with force-placed insurance providers, despite the fact that Defendants actually incur little, if any, expense because: (i) the force-placed insurance policies are automatically issued pursuant to pre-arranged agreements with providers; and/or (b) Defendants' captive reinsurance agreements provide for little or no actual transfer of risk;

(g) Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

25

(h) Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage;

(i) Procuring force-placed insurance policies to cover time periods during which the mortgagee is already covered; and;

(j) Failing to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom Defendants had a commission and/or captive reinsurance arrangement.

105.    As direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the other Class members have suffered damages.

106.    Plaintiffs and the other Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

## COUNT THREE
## BREACH OF CONTRACT

107.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

108.    Defendants have serviced loans evidenced by substantially similar standard form notes and mortgage contracts.

109.    To the extent that the mortgage contracts of Plaintiffs and the Class permitted Defendants unilaterally to "force-place" insurance, Defendants were contractually obligated to exercise their discretion to do so in a reasonable manner.

110.    Nonetheless, Defendants have imposed and/or collected amounts that exceeded the amounts necessary to protect the mortgagee's interest in the policy. Such practices have included, without limitation: (a) requiring borrowers to pay amounts for insurance coverage that exceed the amounts necessary to protect the mortgagee's interest in the secured property; (b)

26

backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no loss occurred during the lapsed period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement that already protects the lender's interest in the property.

111.    Defendants have thus breached the mortgage contracts of Plaintiffs and the other Class members.

112.    Plaintiffs and the other Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

## COUNT FOUR
## VIOLATION OF FLORIDA'S DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT

113.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

114.    Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA"), prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

115.    Plaintiffs are "consumers" as defined in § 501.203(7) of the Florida Deceptive and Unfair Trade Practices Act.

116.    Defendants have engaged in, and continue to engage in, unconscionable acts or practices and used unfair or deceptive acts in the conduct of their trade and/or commerce in the State of Florida.

117.     The policies, acts, and practices alleged herein were intended to result and did result in the payment of excessive fees for force-placed insurance by the Plaintiffs and which in turn were intended to generate unlawful or unfair kickbacks or commission for Defendants.

118.     Defendants' conduct of charging an unreasonable and excessive fee for their force-placed insurance to Plaintiff and class members violates FDUTPA and was implemented and executed within Florida which has an interest in prohibiting violations of FDUTPA.

119.     Plaintiffs and the Class members sustained damages as a direct and proximate result of Defendants' unfair an unconscionable practices. Section 501.211(2) of the Florida Statutes, provides Plaintiffs and the class members a private right of action against Defendants and entitles them to recover their actual damages, plus attorney fees and costs.

120.     Plaintiffs and the Class members need not show actual reliance on the representations or omissions by the Defendants. They need only show that the deceptive conduct would deceive an objective reasonable consumer. *See Fitzpatrick v. General Mills, Inc.*, No. 10-11064, 2011 WL 1103005 * 3 (11th Cir., March 25, 2011).

121.     Plaintiffs and the class members have suffered and will continue to suffer irreparable harm if Defendants continues to engage in such deceptive, unfair, and unreasonable practices.

122.     Plaintiffs and the other Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

## COUNT FIVE
## UNJUST ENRICHMENT AND DISGORGEMENT

123.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

124.     Plaintiffs and the members of the Class have conferred a substantial benefit upon Defendants which has been appreciated by Defendants. During the Class Period, Defendants have wrongfully collected millions of dollars in purported commission payments and reinsurance premiums and derived from the force-placed insurance premiums paid by Plaintiffs and the putative Class members.

125.     These payments were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiffs and the members of the Class.

126.     As a result of Defendants' unjust enrichment, Plaintiffs and the respective Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

127.     Further, Plaintiffs and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PLAINTIFFS' RESPA CLAIMS ARE TIMELY

128.     To the extent that any of Plaintiffs' or the putative Class members' RESPA claims accrued prior to one year preceding the commencement of this action, equitable tolling is available under RESPA and should apply. Plaintiffs and the members of the putative Class could not, despite the exercise of due diligence, have discovered the underlying basis for their claims. Further, Defendants knowingly and actively concealed the basis for Plaintiffs' claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing. For these reasons, any delay by the members of the putative Class whose claims accrued prior to one year preceding the commencement of this action was excusable.

129.    Due to the complex, undisclosed and self-concealing nature of Defendants' scheme to collect illegal kickbacks from force-placed insurance providers, Plaintiffs and the putative Class members whose RESPA claims accrued prior to one year preceding the commencement of this action did not possess sufficient information or possess the requisite expertise in order to enable them to discover the true nature of Defendants' unlawful kickback arrangements.

130.    Plaintiffs and the putative Class members had no reasonable basis upon which to investigate the validity of any commission and/or reinsurance payments to Defendants and Defendants' affiliates.

131.    Indeed, Plaintiffs' and the putative Class members' delay was excusable because they did not discover, and reasonably could not have discovered Defendants' conduct as alleged herein absent specialized knowledge and/or assistance of counsel

132.     Further, Defendants engaged in affirmative acts to conceal the facts and circumstances giving rise to the claims asserted herein and made affirmative misrepresentations that are distinct from the actual conduct challenged herein. Defendants used form notices to affirmatively mislead borrowers about Defendants' relationships with force-placed insurance providers, to represent that, rather than a kickback or unearned fee, any payments received from such providers were for actual services rendered, which had no impact upon the borrowers' costs and to falsely represent that its reinsurance arrangements provided for a real transfer of risk when such was not the case.

133.    Plaintiffs and the Class did not possess sufficient information to even put them on notice of the true nature of Defendants' captive reinsurance arrangements. The average homebuyer is not an insurance expert. Simply being told that Defendants' selected force-placed

insurance provider may "reinsure" with an affiliate of Defendants is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that his/her rights under RESP A may be violated. This is especially so because Defendants made affirmative misrepresentations about the nature of the reinsurance agreements, falsely representing that they provided for real or meaningful risk transfer when they did not. Defendants thus intentionally designed any disclosure provided to its borrowers in such a manner as to conceal from them information sufficient to put them notice of the underlying basis for their claims and affirmatively misrepresent the nature of the arrangements.

134.    Additionally, information concerning Defendants' collection of kickbacks from force-placed insurance providers has not been publicly available. As American Banker noted, "banks do not report how much they collect from such payments," and, further, force-placed insurance has been "historically an overlooked niche in the mortgage servicing industry." *See Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies, supra.*

135.    Further, Plaintiffs and the Class members would have been more than hard pressed to discover fully the true contours of Defendants' scheme because, upon information and belief, captive reinsurance companies are often not required to file with the NAIC the type of detailed annual reports usually required of commercial insurance companies. *See, e.g.,* Janis Mara, *Industry News, Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes,* March 7, 2005, http://www.alta.org/indynews/news.cfm?newsID=2571. Thus, even the most sophisticated borrower could not, for example, simply contact the NAIC to obtain information on Defendants' affiliated captive reinsurer. One would need a subpoena to obtain such information; and to obtain a subpoena, one would have to file a case.

136.    Because of Defendants' actions and because of the nature of the reinsurance scheme, the absent putative Class members were not put on notice of Defendants' wrongdoing despite exercising due diligence.

137.    Because any delay by the absent putative Class members is excusable, it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C.. § 2614 in a way that would preclude the claim of any Plaintiff or absent Class member.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and all similarly situated individuals demand judgment against Defendants as follows:

(1) Declaring this action to be a proper class action maintainable pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the class;

(2) Awarding damages sustained by Plaintiffs and the Classes as a result of Defendants' breach of the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(3) Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the Class, together with prejudgment interest;

(4) Declaring the provision in the mortgage instrument relating to force-placed insurance to be procedurally and substantively unconscionable and requiring Defendants to refund an amount equal to all hidden profits or other financial benefits collected from Plaintiffs and the Class, and to rescind all such amounts charged but not yet collected from Plaintiffs and the Class by virtue of the provision;

32

(5) Awarding damages, injunctive relief, declaratory relief, attorney's fees, and costs under Florida's Deceptive and Unfair Trade Practices Act;

(6) Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses;

(7) Awarding treble damages as a result of Defendants violation of section 2607 of the Real Estate Settlement and Procedure Act together with attorney's fees and costs; and

(8) Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: May 17, 2012                    Respectfully submitted,


/s/ Garrett Barten
Alan M. Weisberg, Esq.
Florida Bar Number: 479349
Garrett A. Barten, Esq.
Florida Bar Number: 55371
**CHRISTOPHER & WEISBERG, P.A.**
200 East Las Olas Boulevard, Suite 2040
Fort Lauderdale, Florida 33301
Phone: 954.828.1488
Fax: 954.828.9122
aweisberg@cwiplaw.com
gbarten@cwiplaw.com

Krishna B. Narine
Joel C. Meredith
**Meredith & Narine**
1521 Locust Street, 8th floor
Philadelphia, PA  19102
Phone: 215-564-5182

33

Fax: 215-569-0958
knarine@m-npartners.com
jmeredith@m-npartners.com

Steven A. Kanner
Douglas A. Millen
**Freed Kanner London & Millen LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Phone: 224-632-4521
Fax: 224-632-4521
skanner@fklmlaw.com
dmillen@fklmlaw.com

Anthony D. Shapiro
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Phone: (206) 623-7292
Fax: (206) 623-0594
Email:  tony@hbsslaw.com